**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AKERSON ADVERTISING & MARKETING,
INC. and GEORGE E. AKERSON,

                              **Plaintiffs,**

            v.                                              **1:13-CV-43**
                                                            **(FJS/CFH)**
ST. JOHN & PARTNERS ADVERTISING
AND PUBLIC RELATIONS, INC.,

                              **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**STEVEN ZALEWSKI &**                     **DUSTIN B. BOWMAN, ESQ.**
**ASSOCIATES PC**
125-10 Queens Boulevard
Suite 218
Kew Gardens, New York 11415
Attorneys for Plaintiffs

**ADAMS AND REESE LLP**                   **CAROLINE M. PRIETO, ESQ.**
501 Riverside Avenue, 7th Floor           **TIMOTHY W. VOLPE, ESQ.**
Jacksonville, FL 32202
Attorneys for Defendant

**TRACHTENBERG RODES &**                  **BARRY J. FRIEDBERG, ESQ.**
**FRIEDBERG LLP**
545 Fifth Avenue
New York, New York 10017
Attorneys for Defendant

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Currently before the Court is Defendant's motion to dismiss Plaintiffs' amended

complaint.  *See* Dkt. No. 27.

## II. BACKGROUND

On August 2, 2013, the Court heard oral argument in support of, and in opposition to, Defendant's motion to dismiss Plaintiffs' complaint and Plaintiffs' cross-motion for leave to amend their complaint.  At the conclusion of the argument, the Court denied both motions without prejudice and with leave to renew.  In an Order dated August 5, 2013, the Court ordered that, "within **twenty (20) days** of the date of this Order, Plaintiffs may file an amended complaint.  As the Court noted at oral argument, in any such amended complaint that Plaintiffs file, they may **not** replead their fraud claim[.]"  *See* Dkt. No. 23 at 2.  The Court further ordered that, if Plaintiffs filed an amended complaint within the required time frame, Defendant was to file its response, either an answer or an appropriate motion, to the amended complaint within the time frames set forth in Rule 12 of the Federal Rules of Civil Procedure.  *See id.*

Plaintiffs filed an amended complaint, in which they asserted five causes of action and to which they attached five exhibits.  *See* Dkt. No. 25.  According to the amended complaint, Plaintiff Akerson is the principal of Plaintiff Akerson Advertising and Marketing, Inc. ("AAMI"), which is a small advertising firm in Upstate New York.  *See id.* at ¶ 4.  Plaintiff AAMI's largest account was the Upstate Ford Dealers Advertising Association ("UFDAA"), a group of twenty-two Ford Dealers in Upstate New York.  *See id.*  Plaintiff Akerson first met St. John, the principal of Defendant, in 1978.  *See id.* at ¶ 8.  Plaintiff Akerson formed Plaintiff AAMI and St. John formed Defendant at about the same time.  *See id.* at ¶ 9.  St. John, Plaintiff Akerson, and a few others helped form the National Organization of Independent Advertising Agencies ("IAA"),

which worked for Ford Dealer Groups across the country in sharing ideas and operational procedures. *See id.* By the beginning of 2012, Defendant had grown significantly and had four major Ford Dealer Groups as clients in the South, Michigan, and Pittsburgh with five offices in Jacksonville, Atlanta, New Orleans, Pittsburgh and Detroit. *See id.* at ¶ 10.

Ford Motor Company put a plan together, in Spring 2009, to eliminate all of the Independent Ad Agencies, of which Plaintiff AAMI and Defendant were two. *See id.* at ¶ 11. By Fall 2009, Ford Motor Company had pushed the Ford Dealer Groups using independent advertising agencies to permit J. Walter Thompson ("JWT") to give presentations. *See id.* Plaintiff AAMI was the only independent ad agency that did not have to make a presentation against JWT; UFDAA was not interested and would not let JWT present. *See id.* at ¶ 12. After the JWT presentations, Defendant was able to retain its dealer groups. *See id.* at ¶ 13.

In Fall 2009, Ford Motor Company completely changed the Ford Dealer Group rules and regulations to commence January 15, 2010. *See id.* at ¶ 15. Ford set the new rules up so that the independent ad agencies would get considerably less ad agency commissions than their counterparts at JWT. *See id.*

Also in Fall 2009, Plaintiff Akerson began to consider an exit strategy for himself and UFDAA as he was nearing retirement. *See id.* at ¶ 18. Plaintiff Akerson's relationship with the members of UFDAA and his years of work made him committed to making his exit mutually agreeable to UFDAA and Plaintiff AAMI. *See id.* Plaintiff Akerson knew that UFDAA was committed to its independent status and wanted to ensure that this status was retained. *See id.*

Since Defendant was so clearly committed to independent advertiser status, Plaintiff Akerson was led to believe that entering into an asset transfer agreement between Plaintiff AAMI

and Defendant would be perfect. *See id.* at ¶ 19. Plaintiff Akerson would be able to retire,

UFDAA would be able to maintain independent advertising, and Defendant would have another

Ford Dealer Association as a client. *See id.* Defendant did not have the money for an immediate

buyout. *See id.* at ¶ 20.

Plaintiff Akerson knew he was going to need additional support in the media and creative

arenas to meet all of Ford's new requirements; therefore, he approached Defendant for use as a

"supplier" to provide the support needed. *See id.* at ¶ 21. This need manifested into the first

letter agreement among Plaintiff AAMI, Defendant, and UFDAA. *See id.* and Exhibit "A"

attached thereto. This agreement was designed to keep Plaintiff AAMI viable, in all areas, while

Defendant and Plaintiff Akerson could hammer out a deal acceptable to all parties. *See id.* at

¶ 22.

On or about November 2010, Plaintiff Akerson traveled to Defendant's home office to

hammer out all of the details of how to keep Plaintiff AAMI operational until the assets of

Plaintiff AAMI were sold to Defendant. *See id.* at ¶ 23. The final agreement, which was

reflected in a January 10, 2011 letter, was a result of the November 2010 meeting in Jacksonville.

*See id.* at ¶ 24. The agreement entered into at the November 2010 meeting, included the

following terms: (1) on December 24, 2010, Plaintiff AAMI would transfer all responsibility to

Defendant for the management and execution for all aspects of the UFDAA account, including

but not limited to account management, media, creative, billing and accounting; (2) the purchase

price of the assets of Plaintiff AAMI would be independently assessed at fair market value as of

the first quarter of 2013 and paid on or before March 31, 2013; (3) for each month between

January 2011 and January 2013, Defendant would pay Plaintiff AAMI at the end of each such

month 10% of gross revenue; and (4) Defendant agreed not to transfer responsibility for the management and execution of all aspects of the UFDAA account to Retail First, Inc.[1]  *See id.*  Plaintiff Akerson did not require a formal contract as a result of the confidential relationship between him and St. John; and, in any event, the January 10, 2011 letter contained all essential terms of the agreement.  *See id.* at ¶ 25 & Exhibit "B" attached thereto.

From the end of the November 2010 meeting in Jacksonville to the receipt of the letter dated January 10, 2011, there were no further discussions between Plaintiff AAMI and Defendant.  *See id.* at ¶ 26.  Based on the terms of the January 10, 2011 letter, Defendant took over operational control as ad agency of record for UFDAA at its Annual Meeting on Friday, January 14, 2011.  *See id.* at ¶ 26.  To this end, Defendant and UFDAA entered into a contract, which evidenced the transfer of control of the UFDAA account from Plaintiff AAMI to Defendant starting January 1, 2011.  *See id.* & Exhibit "C" attached thereto.[2]

Chuck Wehde, Defendant's Executive Vice President and Managing Director, continued to inform all of the Upstate Ford Dealers, Ford Motor Company, and Plaintiff Akerson that Defendant was very excited and happy to have been able to work out a deal with Plaintiff AAMI to allow Plaintiff Akerson to have a very successful and profitable exit strategy.  *See id.* at ¶ 27.  All of the members of UFDAA were aware of all aspects and details of the deal between Defendant and Plaintiff AAMI to include the provision to execute a buy-out of Plaintiff AAMI

---

[1] Retail First, Inc. is operated by Team Detroit, Inc., which is a collective of six WPP-owned agencies (JWT, Young & Rubicam, Wunderman, Ogilvy & Mather, MEC and Mindshare) with Ford as the major client.  *See* Amended Complaint at ¶ 17.

[2] Exhibit "C" is an unexecuted copy of an agreement.  Plaintiffs state that, because the parties have not conducted any discovery, they do not have access to an executed copy of this agreement.

no later than March 31, 2013, based on the current value of Plaintiff AAMI at that time and to include the UFDAA advertising placed with Defendant during the calendar years of 2011 and 2012. *See id.* at ¶ 28.

Plaintiff Akerson received a phone call from St. John on Friday, April 1, 2011, in which St. John informed him that Defendant had sold all Ford Dealer Groups to JWT on March 28, 2011. *See id.* at ¶ 28. In addition, on or about April 2, 2011, Plaintiff Akerson had conversations with one of Defendant's principals who told him that (1) the deal between Defendant and Team Detroit, Inc. had been signed and was a done deal; (2), as part of the agreement, Team Detroit, Inc. (also referred to as "Retail First, Inc.") had agreed to hire all of the account people from Defendant who had been working on the UFDAA account for Defendant, i.e., Wehde, Pam Kidd-Mitchell, and Mike Phelan; and (3) Defendant had signed a no-compete clause. *See id.* at ¶ 28. On or about April 6, 2011, Defendant transferred the business assets of Plaintiff AAMI and management of the UFDAA account to a third party, Team Detroit, Inc. *See id.* at ¶ 29 & Exhibit "D" attached thereto.[3]

On or about May 4, 2011, Mr. Wehde, now working for Team Detroit, Inc., the third party to whom Defendant transferred the UFDAA Account, sent a letter to Plaintiffs indicating that the account was transferred. *See id.* at ¶ 30 & Exhibit "E" attached thereto. Finally, to date, Defendant has failed to pay Plaintiff AAMI the agreed upon consideration. *See id.* at ¶ 31.

Based on these allegations, Plaintiffs assert five causes of action. In their first cause of action for breach of contract, Plaintiffs allege that they entered into a contract to sell Plaintiff

---

[3] Exhibit "D" is an unexecuted copy of an agreement. Plaintiffs state that, because the parties have not conducted any discovery, they do not have access to an executed copy of this agreement.

AAMI or its assets to Defendant, that they fully performed pursuant to the contract, that Defendant materially breached the contract by, among other things, failing to pay agreed consideration to Plaintiffs and transferring assets of Plaintiff AAMI to Team Detroit, Inc. *See id.* at ¶¶ 32, 29, 30, 31, 32.[4] Plaintiffs claim that, as a result of Defendant's breach, they have been damaged in an amount no less than $5,000,000.00.

In their second cause of action for breach of contract - implied covenant, Plaintiffs argue that, at the time they entered into the contract with Defendant, Defendant was aware that it would sell the business of Plaintiff AAMI to a third party to which Plaintiff AAMI and Defendant agreed not to sell. *See id.* at ¶ 34. Plaintiffs further allege that Defendant attempted to add additional terms to the contract in order to accept the benefits of the deal without making any payment therefor and that, by doing so, Defendant materially breached the contract and the implied covenant of good-faith and fair-dealing. *See id.* at ¶¶ 35-36. Plaintiffs claim that, as a result of Defendant's breach, they have been damaged in an amount no less than $5,000,000.00. *See id.* at ¶ 37.

In their third cause of action for unjust enrichment, Plaintiffs claim that Plaintiff AAMI transferred the control of the UFDAA account to Defendant and that the value of that account was no less than $5,000,000.00. *See id.* at ¶ 40. Furthermore, Plaintiffs assert that, despite Defendant's acceptance and retention of the UFDAA account and subsequent sale for value, Defendant failed to pay adequate consideration to Plaintiffs. *See id.* at ¶ 41. Plaintiffs claim that, as a result of Defendant's unjust enrichment, they were damaged in an amount no less than

---

[4] All of the paragraph numbers to which the Court refers in this Memorandum-Decision and Order are as designated in the amended complaint. There are several typographical errors in the numbering of the paragraphs in the amended complaint.

$5,000,000.00. *See id.* at ¶ 42.

In their fourth cause of action for breach of contract, Plaintiffs contend that Defendant entered into a verbal contract in which, among other things, the parties agreed that (1) between January 2011 and January 2013, at the end of each month Defendant would pay Plaintiffs 10% of gross profits and (2) Defendant would not transfer control of the UFDAA account from Defendant to any third party. *See id.* at ¶ 44. Plaintiffs fully performed pursuant to the contract by transferring control of the UFDAA account to Defendant; and Defendant breached the agreement by, among other things, failing to pay Plaintiffs pursuant to the Agreement and transferring control of the UFDAA account to a third party. *See id.* at ¶¶ 45-46. Plaintiffs claim that, as a result of Defendant's breach, they have been damaged in an amount no less than $5,000,000.00. *See id.* at ¶ 47.

Finally, in their fifth cause of action for a constructive trust, Plaintiffs state that Plaintiff Akerson and St. John, the principal of Defendant, had a confidential relationship, *see id.* at ¶ 49; and Defendant agreed and promised to, among other things, (1) pay Plaintiffs certain consideration for the transfer of control of the UFDAA account and (2) not to transfer the UFDAA account to a third party, *see id.* at ¶ 50. Plaintiffs assert that, in light of such relationship and in reliance on such promise, Plaintiffs transferred the control of the UFDAA account to Defendant. *See id.* at ¶ 51. Plaintiffs assert that Defendant breached the agreement and promise by (1) transferring the UFDAA account to a third party and (2) by failing to pay certain consideration. *See id.* at ¶ 52. Therefore, Plaintiffs assert that they have been damaged in an amount no less than $5,000,000.00. *See id.* at 53.

## III. DISCUSSION

**A.     Standard of review**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).  This pleading standard does not require "detailed factual allegations," but it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  The complaint must tender more than mere "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955).

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quotation omitted).  A court must "draw all reasonable inferences in favor of the non-moving party." *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007) (citation omitted).  Furthermore, when deciding a motion to dismiss for failure to state a claim, a court may consider the following without triggering the summary judgment standard:

> "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case."

*Pflaum v. Town of Stuyvesant*, 937 F. Supp. 2d 289, 300 (N.D.N.Y. 2013) (quoting *Planck v. Schenectady Cnty.*, No. 12-CV-0336, 2012 WL 1977972, at *5 (N.D.N.Y. June 1, 2012)

(Suddaby, J.)).

Finally, the Court notes that it is appropriate for a court to consider the affirmative defense of statute of frauds on a motion to dismiss. *See Rosbach v. Indus. Trading Co., Inc.*, 81 F. Supp. 2d 522, 524 (S.D.N.Y. 2000) (citation omitted).


**B.      Plaintiffs' first cause of action - breach of contract**

According to Plaintiffs' amended complaint, the terms of the oral agreement between Plaintiffs and Defendant, reached in November 2010, are as follows:

> (1) on December 24, 2010, Plaintiff AAMI would transfer all responsibility to Defendant for the management and execution for all aspects of the UFDAA account, including but not limited to account management, media, creative, billing and accounting;
>
> (2) the purchase price of the assets of Plaintiff AAMI would be independently assessed at a fair market value as of the first quarter of 2013 and paid on or before March 31, 2013;
>
> (3) for each month between January 2011 and January 2013, Defendant would pay Plaintiff AAMI at the end of each such month 10% of gross revenue; and
>
> (4) Defendant would not transfer responsibility for the management and execution for all aspects of the UFDAA account to Retail First, Inc.

*See* Amended Complaint at ¶ 24.

The January 20, 2011 letter from Defendant's Executive Vice President Chuck Wehde to Plaintiff Akerson, on which Plaintiffs rely to support their argument that the November 2010 oral agreement was subsequently memorialized in writing states, in pertinent part, as follows:

> At dinner your last night [apparently the November 2010 meeting] we discussed the trials and tribulations of the last 18 months with

-10-

Ford, as well as your initial call looking for help with the FDAF. Over the first few calls, as we looked for ways to help, the discussion morphed from how we could help AAMI into how we transition the business from AAMI to [Defendant] SJ&P. The dealers wanted to take care of you (rightfully so; you've done a great job for their businesses and you have a wonderful relationship with them and their families!) and anxious to get started with us. In looking at ways to work the transition as quickly as the Dealers wanted, we really didn't identify one that worked for both of us which is why we agreed to support Akerson Advertising [AAMI] for a small monthly fee plus expenses. As you recall, we put together a three way agreement to somewhat satisfy the dealers (in that meeting they wanted a separate agreement with us) while, hopefully, enabling you to recover somewhat from the downturn.

* * * * * * * * * *

We wanted to confirm in writing, to clear up any confusion, what the three of us talked about in terms of future compensation. What we agreed to was paying you 10% of the gross revenue from the Upstate Ford Dealers Advertising Association for two years beginning January 1, 2011. Gross revenue is defined as agency commission on media and production and compensation from hourly work and does not include any pass through monies or reimbursed expenses. The 10% will be paid monthly following the first month i.e., January 2011's 10% will be paid at the end of February; provided we've been paid by the client. This agreement would be in effect for the full two years so long as [Defendant] SJ&P retains the business. Additionally, we will not be assuming any expenses from [Plaintiff] AAMI. For this consideration, we would expect you to keep us apprised of any local issues as well as help us continue the smooth transition.

Part of the transition may be attending a few meetings a year . . . at your discretion and ours . . . and [Defendant] SJ&P would pick up your hotel and travel expenses. Additionally, we will enter into a separate agreement as Agency of Record with the Upstate Ford Dealers and cancel the three way agreement.

*See* Dkt. No. 25-2 at 1-2.

***1. New York General Obligations Law § 5-701(a)(10)***

As one basis for its motion to dismiss Plaintiffs' amended complaint, Defendant relies on

New York General Obligations Law § 5-701(a)(10), which provides, in relevant part, as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> \* \* \* \* \* \* \* \* \* \*
>
> 10.  Is a contract **to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein**, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.  "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.  This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

N.Y. Gen. Oblig. Law § 5-701(a)(10) (emphasis added).

Defendant argues that § 5-701(a)(10) bars this claim because it requires contracts for the sale of a

business to be in writing.  *See* Dkt. No. 28-3 at 5.  Defendant is incorrect.  What § 5-701(a)(10)

bars is verbal agreements "to pay compensation **for services rendered in negotiating** . . . the

purchase, sale, exchange, renting or leasing . . . of a . . . business, its good will, inventory,

fixtures or interest therein . . . ."  N.Y. Gen. Oblig. Law § 5-701(a)(10) (emphasis added).

Despite Defendant's argument to the contrary, § 5-701(a)(10) does not apply to this case.

Section 5-701(a)(10) applies to finder's contracts, and there is no "finder" in this case.  Plaintiff

Akerson, the principal of Plaintiff AAMI, simply entered into a verbal agreement with

Defendant.  There was no "finder" or "intermediary" involved in this case.  Furthermore, to the

extent Defendant argues that Plaintiff Akerson acted as an intermediary between Defendant and

the UFDAA, § 5-701(a)(10) would still not apply because clearly Plaintiff Akerson's function

"transcend[ed] the limited role of serving as an intermediary . . . [and, thus,] the Statute of Frauds

does not apply."  *Riley v. N.F.S. Servs., Inc.*, 891 F. Supp. 972, 977 (S.D.N.Y. 1995).  Therefore,

the Court concludes that Defendant's reliance on § 5-701(a)(10) as a basis for its motion to

dismiss is misplaced.


### 2. New York General Obligations Law § 5-701(a)(1)

To support their argument that the verbal agreement could have been performed within

one year per its terms and thus was not barred by the Statute of Limitations, Plaintiffs rely on

*Rosbach v. Indus. Trading Co., Inc.*, 81 F. Supp. 2d 522 (S.D.N.Y. 2000).  In *Rosbach*, the court

noted that

> New York General Obligations Law § 5-701(a)(1) "encompass[es]
> only those contracts which, by their terms, 'have absolutely no
> possibility in fact and law of full performance within one year.'  As
> long as the agreement may be 'fairly and reasonably interpreted'
> such that it may be performed within a year, the Statute of Frauds
> will not act as a bar however unexpected, unlikely, or even
> improbable that such performance will occur during that time
> frame."

*Rosbach*, 81 F. Supp. 2d at 525 (quotation omitted).

Although *Rosbach* is a correct statement of the law, its facts are distinguishable from this

case because, as Plaintiffs' own description of the terms of the November 2010 verbal agreement

demonstrates, this verbal agreement could not have been performed, by its terms, within one year. As noted, under this November 2010 verbal agreement, the fair market value of Plaintiff AAMI's assets would not be determined until **the first quarter of 2013**, more than two years after the parties entered into this verbal agreement. Furthermore, Defendant was not required to pay the fair market value of Plaintiff AAMI's assets to Plaintiffs until after the fair market value was determined. Thus, there is no possibility that this verbal agreement could have been performed within one year.

Plaintiffs attempt to circumvent this problem by referencing the January 10, 2011 letter. As noted, in this letter, Mr. Wehde stated that "[t]his agreement would be in effect for the full two years so long as [Defendant] retain[ed] the business." *See* Dkt. No. 25-2 at 1. Plaintiffs contend that this statement demonstrates that the contract could have been performed within one year if, within the first year, Defendant no longer retained the UFDAA account. *See* Dkt. No. 29-2 at ¶ 21. At the same time, Plaintiffs argue that,

> while it is true that Plaintiff contends that this contingent precedent to payment should not be enforced as 1) Defendant added the term which was not agreed to; and 2) Defendant added the term with the knowledge that it would not retain the business and hence not required to pay the consideration to which it agreed    the inclusion of this term within this letter made the Agreement performable within a year and takes the Contract out of the statute of frauds.

*See id.* at ¶ 22.

There are several problems with this argument. First, Plaintiffs state that Defendant added this term to the verbal agreement and that they did not agree to it. If this term was "added" and Plaintiffs did not agree to this term, then Plaintiffs cannot argue that it was part of the parties' verbal agreement or that it subsequently became part of that agreement. Second, Mr. Wehde's

-14-

statement applies to only one part of the verbal agreement, i.e., that part that states that "[f]or each month between January 2011 and January 2013, [Defendant] would pay [Plaintiff] AAMI at the end of each month 10% of gross revenue." *See* Dkt. No. 25 at ¶ 24. It has no effect on the terms of the agreement that cannot possibly be performed until the first quarter of 2013. Thus, the agreement as a whole cannot be performed within one year.[5]

Furthermore, Plaintiffs' reliance on *AAA Viza, Inc. v. Bus. Payment Sys., LLC*, 28 A.D.3d 802 (2d Dep't 2007), is misplaced. In *AAA Viza*, unlike in this case, the subsequent writing contained "**all** of the agreement's essential terms, so as to defeat . . . the defendant's motion . . . to dismiss the causes[] of action sounding in breach of contract . . . ." *Id.* at 803 (emphasis added). In this case, the January 2011 letter does not contain all the essential terms of the parties' agreement. For example, it makes no mention of the purchase price for Plaintiff AAMI's assets. The only term of the verbal agreement that is mentioned in this letter is the agreement that Defendant would pay Plaintiffs 10% of the gross revenue it received from the UFDAA account each month for a maximum of two years beginning on January 1, 2011. *See* Dkt. No. 25-2 at 1. Thus, there is no basis for finding that the letter contained **all** of the verbal agreement's essential terms.

Accordingly, the Court finds that the January 10, 2011 letter does not remove the verbal agreement from the Statute of Frauds and, therefore, grants Defendant's motion to dismiss

---

[5] The Court finds it interesting that, in Plaintiffs' proposed amended complaint, which they filed with their cross-motion in response to Defendant's first motion to dismiss, they did not include among the terms of the oral agreement anything related to Defendant paying Plaintiff AAMI 10% of gross revenue for each month between January 2011 and January 2013. *See* Proposed Amended Complaint, Dkt. No. 20-5 at ¶ 8. Nor was this term included in Plaintiffs' original complaint.

Plaintiffs' first cause of action for breach of contract.

**C.      Plaintiffs' second cause of action - implied covenant of good faith and fair dealing**

"Under New York law, parties to an express contract are bound by an implied duty of

good faith, 'but breach of that duty is merely a breach of the underlying contract.'" *Morris v.*

*Fordham Univ.*, No. 03 Civ. 0556, 2004 WL 906248, *6 (S.D.N.Y. Apr. 28, 2004) (quotation

omitted).  Since Plaintiffs have asserted a breach of contract claim, this claim is merely

duplicative and suffers the same fate as their first cause of action.  Plaintiffs conceded as much at

oral argument in August 2013.  Therefore, the Court grants Defendant's motion to dismiss

Plaintiff's second cause of action for breach of the implied covenant of good faith and fair

dealing.

**D.      Plaintiffs' third cause of action - unjust enrichment**

"'To prevail on a claim for unjust enrichment [under] New York [law], a plaintiff must

establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and

good conscience require restitution.'" *MGR Meats, Inc. v. Schweid*, No. 10-CV-3068, 2012 WL

6675123, *5 (E.D.N.Y. Dec. 21, 2012) (quotation and other citation omitted).  Thus, the essential

question that the court must answer when addressing any claim for unjust enrichment is

"'whether it is against equity and good conscience to permit the defendant to retain what is sought

to be recovered[.]'" *Id.* (quotation omitted).  Furthermore, "'[t]he theory of unjust enrichment lies

as a quasicontract claim.  It is an obligation the law creates *in the absence of any agreement. . . .*

The existence of a valid and enforceable written contract governing a particular subject matter

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" *Id.* (quotation omitted). If, however, "there is no valid contract that pertains to the disputed issues, a plaintiff may proceed under an unjust enrichment theory." *Id.*

As the court in *Morgenweck v. Vision Capital Advisors, LLC*, 410 F. App'x 400 (2d Cir. 2011), noted, however, "[i]t is well settled that under New York law a plaintiff may not escape the Statute of Frauds by attaching the label 'quantum meruit' or 'unjust enrichment' or 'promissory estoppel' to the underlying contract claim." *Id.* at 402 n.1 (citations omitted). However, "'[i]f the plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result.'" *Feingold v. Hankin*, 91 F. App'x 176, 178 (2d Cir. 2004) (quotation omitted). This is so because, "[u]nder New York law, 'the Statute of Frauds is not an automatic bar to a cause of action for unjust enrichment.'" *Id.* (quotation omitted). Although these two holdings appear to be somewhat contradictory, the distinction appears to be whether the plaintiff "'merely seeks to recover for the value of the work performed' . . . as distinct from the contract price.'" *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 433 (2d Cir. 1995) (internal citation omitted). In the former case, a claim for quantum meruit or unjust enrichment exists; in the latter case it does not. "This is because the cause of action [seeking to recover for the value of the work performed] does not depend upon an unenforceable promise; rather, it 'is in disaffirmance of the void contract.'" *Id.* Thus, where an unjust enrichment claim seeks "'the reasonable value of [the plaintiff's] work and services' and not the benefit of his bargain the claim is distinct from his claims under the contract, and should not [be] dismissed" simply because the Statute of Frauds bars his breach-of-contract claim. *Grappo*, 56 F.3d at 433.

Plaintiffs' third cause of action, although it realleges all of the allegations made in the

previous paragraphs, some of which include information about Defendant's alleged agreement to

pay Plaintiffs 10% of the gross revenue it earned from the UFDAA account each month from

January 1, 2011, to January 1, 2013, specifically relies on the following allegations:

> 39. Plaintiff AAMI transferred the control of the Upstate Ford
> Dealers Advertising Account to Defendant.

> 40. The value of the Upstate Ford Dealers Advertising Account
> was in no case less than Five Million Dollars ($5,000,000.00).

> 41. Despite Defendant's acceptance and retention of the Upstate
> Ford Dealers Advertising Account and subsequent sale for value,
> Defendant failed to pay adequate consideration to Plaintiffs.

> 42. As a result of Defendant's Unjust Enrichment, Plaintiffs have
> been damaged in an amount to be determined at trial, but in no case
> less than Five Million Dollars ($5,000,000.00).

*See* Amended Complaint at ¶¶ 39-42.

These paragraphs clearly seek the benefit of the bargain, i.e., the value of the assets of Plaintiff

AAMI, which Defendant allegedly transferred or sold to a third party. This is part of the alleged

oral agreement between the parties and has nothing to do with any agreement that Defendant

would pay future compensation to Plaintiff Akerson for work he performed for Defendant

between January 1, 2011, and March 31, 2011.[6]

Moreover, in their papers in opposition to Defendant's motion to dismiss, Plaintiffs

appear to want to expand the basis for their third cause of action by stating that, if the contract is

void for the statute of frauds as to the balloon payments or any portion of the monthly payments,

they would seek unjust enrichment for the partial payments. *See* Dkt. No. 29-2 at 9. However, a

---

[6] Although Plaintiffs state that Defendant transferred the UFDDA account to Retail First at the end of March 2011, they contend that Defendant continued to work on the UFDDA account until the end of June 2011.

"[p]laintiff cannot 'cure' his pleading deficiencies in the complaint by addressing them in his motion papers." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 344 (S.D.N.Y. 2001).

Finally, these monthly payments are **not** compensation for any work that Plaintiff Akerson performed for Defendant. In fact, they are based on the work that Defendant performed on the UFDAA account, for which Defendant agreed to pay Plaintiffs 10% of the gross revenue that it received for that work each month from January 1, 2011, to January 1, 2013. Finally, Plaintiffs seek at least $5,000,000.00 as damages on their unjust enrichment claim, which is the same amount they seek on their breach-of-contract claims. If Plaintiffs' claim was based solely on the monthly payments from January 1, 2011, to January 1, 2013, the damages would be somewhere between $60,000.00 and $140,000.00 had the agreement continued for the entire two-year period. *Compare* Affidavit of Dan St. John dated August 26, 2013, at ¶ 17 (stating that "[h]ad [Defendant] continued to provide services to UFDAA, Akerson would have been paid the 10% commission amount for two years which would have been approximately $30,000 per year for a two year period"); Affidavit of George E. Akerson dated December 24, 2013, at ¶ 37 (stating that "[t]he allegations in paragraph 17 of the affidavit of Dan St. John are totally inaccurate. Commissions actually paid to Plaintiffs by Defendant were a little over $10,000 through March 31, 2013. [sic] The 1st quarter of the year is historically the lowest grossing quarter of the year. The 2nd-4th quarters of the year are always stronger and should have generated closer to $15,000-$20,000 per quarter. Therefore, the projection for 2011 should have been closer to $70,000 per year, not $30,000 as alleged by St. John.").

Based on Plaintiffs' allegations and drawing all reasonable inferences from those allegations, the Court concludes that Plaintiffs seek nothing more than the benefit of the bargain,

which is based on an oral agreement that is barred by the Statute of Frauds.  Therefore, the Court grants Defendant's motion to dismiss Plaintiffs' third cause of action alleging unjust enrichment.

### E.    Plaintiffs' fourth cause of action - breach of contract

In their fourth cause of action for breach of contract, Plaintiffs allege that "Plaintiffs and Defendant entered into a verbal contract in which, amongst other things, it was agreed that: a) between January 2011 and January 2013, at the end of each month Defendant agreed to pay Plaintiffs 10% of gross profits; b) Defendant would not transfer control of UFDA from Defendant to any third-party." *See* Dkt. No. 25 at ¶ 44.  Furthermore, Plaintiffs assert that they "fully performed pursuant to the contract by transferring control of UFDA to Defendant." *See id.* at ¶ 45.  Plaintiffs allege that "Defendant breached the agreement, by amongst other things, failing to pay Plaintiffs pursuant to the Agreement and transferring control of the UFDA account to a third-party." *See id.* at ¶ 46.  Finally, Plaintiffs seek damages of no less than $5,000,000.00 for Defendant's alleged breach.  *See id.* at ¶ 47.

With some minor differences in language, Plaintiffs' first and fourth causes of action refer to the same contract, seek the same amount of damages, and allege at least one breach in common.  The only difference between the two causes of action is that the first cause of action refers specifically to the sale of the assets of Plaintiff AAMI to Defendant as well as Defendant's alleged transfer of those assets to a third party, while the fourth cause of action refers specifically to the making of certain monthly payments to Plaintiffs for at most a two-year period as well as Defendant's alleged transfer of the UFDAA account, i.e., Plaintiff AAMI's assets, to a third party.

Plaintiffs have never claimed that they entered into two agreements with Defendant    one

for the sale of Plaintiff AAMI's assets to Defendant and one pursuant to which Defendant would pay Plaintiffs 10% of gross revenues for a period not to exceed two years.  In fact, according to Plaintiffs, these alleged promises were part of a larger agreement, under which Plaintiffs agreed to sell Plaintiff AAMI's assets to Defendant for consideration that consisted of monthly payments of 10% of gross profits from January 2011 to January 2013, the appraisal of Plaintiff AAMI's assets in the first quarter of 2013, and the sale of those assets at a price based on that appraisal by March 31, 2013.

As already discussed, the Statute of Frauds bars the verbal agreement, which allegedly contained all of these terms.  That these terms are part of a single agreement is evidenced by the fact that Plaintiffs seek the same damages in both causes of action and those damages relate to the alleged value of Plaintiff AAMI's assets and not to damages that would have occurred had Defendant only agreed to pay Plaintiffs 10% of the gross profits monthly for up to two years for Defendant's work on the UFDAA account, which, in a best case scenario, would have equaled approximately $140,000.00.

For all of these reasons, the Court finds that Plaintiffs' fourth cause of action is based on the same oral agreement that forms the basis of their first cause of action and, thus, is barred by the Statute of Frauds.  Therefore, the Court grants Defendant's motion to dismiss Plaintiffs' fourth cause of action.


**F. Plaintiffs' fifth cause of action for a constructive trust**

Pursuant to New York law, a plaintiff who claims entitlement to a constructive trust must generally establish four elements: "(1) a confidential or fiduciary relationship; (2) a promise,

express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re: Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992) (citations omitted). "Although these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.'" *Id.* (quotation and other citation omitted). "'"When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."'" *Id.* at 353 (quotation omitted). "The doctrine's '"applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them."'" *Id.* (quotation omitted). Nonetheless, "[p]urely commercial transactions do not give rise to a fiduciary relationship." *Id.* (citations omitted).

Lack of a fiduciary relationship, however, will not automatically defeat a plaintiff's claim for a constructive trust. *See id.* "Although a fiduciary relationship is one of the factors cited by New York courts, the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity." *Id.* (citations omitted). New York courts have consistently applied the constructive trust doctrine with sufficient flexibility to prevent unjust enrichment in a variety of circumstances. *See id.* (citation omitted). Moreover, the New York Court of Appeals has expressly held that a person wrongfully acquiring property can be treated as a constructive trustee even if a fiduciary relationship dose not exist. *See id.* at 353-54 (citations omitted). "[T]he key factor is unjust enrichment, not willfully wrongful conduct." *Id.* at 354.

Furthermore, "to establish a claim for constructive trust, the plaintiff must make an allegation that is not merely 'duplicative of the breach of contract claim; but instead must 'allege .

. . . distinct harm or actions giving rise to a[] separate claim [for a] constructive trust.'" *Pena v. Guzman*, 03 Civ. 5130, 2004 WL 253331, *2 (S.D.N.Y. Feb. 11, 2004) (quotation omitted). In addition, "[c]ourts adhere to the principle that a constructive trust should not be imposed unless 'it is demonstrated that a legal remedy is inadequate,' . . . and the constructive trust is 'essential to prevent unjust enrichment.' . . ." *Id.* at *3 (internal quotations and citations omitted); *see also Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (holding that "[a]s a form of equitable relief, the imposition of a constructive trust requires the absence of an adequate remedy at law" (citations omitted)).

In support of their constructive trust cause of action, Plaintiffs allege the following:

> 49. Plaintiff Akerson and the principal of Defendant have a confidential relationship.

> 50. Defendant agreed and promised to, among other things: a) pay Plaintiff certain consideration for the transfer of control of the UFDA account; and b) not to transfer the UFDA account to any third-party.

> 51. In light of such relationship and in reliance of such promise, Plaintiff transferred the control of the UFDA account to Defendant.

> 52. Defendant breached the agreement and promise by: a) transferring the UFDA account to a third-party; and b) failing to pay certain consideration.

*See* Amended Complaint at ¶ 49-52.

As a result of Defendant's alleged breach, Plaintiffs contend that they have been damaged in an amount not less than $5,000,000.00. *See id.* at ¶ 53.

Very simply, Plaintiffs claim for imposition of a constructive trust fails because Plaintiffs have not demonstrated that they do not have an adequate remedy at law. To the contrary, they

seek $5,000,000.00 in damages in this cause of action, which clearly indicates their acknowledgment that they have an adequate remedy at law. Moreover, the allegations in the amended complaint demonstrate that this cause of action is duplicative of Plaintiffs' breach-of-contract claims. Therefore, the Court grants Defendant's motion and dismisses Plaintiffs' fifth cause of action for imposition of a constructive trust.

## IV. CONCLUSION

After reviewing the entire record in this case, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss Plaintiffs' amended complaint in its entirety is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: February 25, 2015
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge